[No. A112977. First Dist., Div. Three. Jan. 31, 2008.]

S&S CUMMINS CORPORATION, Plaintiff and Appellant, v.
WEST BAY BUILDERS, INC., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I. and II. of the Discussion.

COUNSEL

Thurbon & McHaney, Robert E. Thurbon, Jacqueline S. McHaney and Erin E. Holbrook for Plaintiff and Appellant.

McInerney & Dillon, Timothy L. McInerney, LeCarie S. Whitfield; Reed Smith and Paul D. Fogel for Defendant and Appellant.

OPINION

**McGUINESS, P. J.**—A project to build a public elementary school in Pleasanton suffered substantial delays. After the school was built, the general contractor, West Bay Builders, Inc. (West Bay), refused to release to the electrical subcontractor, S&S Cummins Corporation (Cummins), its share of "retention proceeds" that the school district paid to West Bay following the school's completion. West Bay justified its refusal to pay Cummins its share of retention proceeds on the ground that Cummins had contributed to delays that caused West Bay to incur damages. Cummins sued for breach of contract, seeking contract damages as well as statutory charges for West Bay's failure to make prompt payment of the retention proceeds. Following a jury trial, the trial court entered judgment in favor of Cummins for $400,971.

Both West Bay and Cummins appeal from the judgment. West Bay contends the judgment is not supported by substantial evidence, and asserts that the proper application of indemnity and "damages caused by delay" provisions in the subcontract would completely offset Cummins's damages, compelling a reversal of the judgment. Cummins challenges the trial court's calculation of statutory prompt payment charges, claiming the court erred when it concluded the 2 percent per month charge set forth in Public Contract Code section 7107 is applied on an annual basis rather than compounded on a monthly basis. Cummins also contends the court erred by ruling that the 2 percent per month statutory charge ceases accruing upon entry of judgment. In the published portion of the opinion, we hold that statutory prompt payment charges imposed under subdivision (f) of Public Contract Code section 7107 cease to accrue upon entry of judgment and are not compounded on a monthly basis.

We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The prime contract and the Cummins subcontract*

West Bay was the successful low bidder on a public works project in Pleasanton known as the Phoebe Apperson Hearst Elementary School (hereafter the project or school). On October 13, 1999, West Bay entered into a prime contract with the Pleasanton Unified School District (District) to construct the school. The prime contract anticipated a contract price, before modifications or change orders, of slightly over $10.3 million.

West Bay hired Cummins as the electrical subcontractor on the project. The contract price, as expressed in the West Bay-Cummins subcontract agreement (Cummins subcontract), dated October 15, 1999, was $1,279,150. The contract price rose to $1,315,216 after accounting for approved change orders and additional work and materials requested by West Bay during the course of the project.

### *Construction delays*

The District issued the notice to proceed on November 2, 1999. Under the original project schedule, West Bay was to complete its work on August 28, 2000, or 300 calendar days after work began. During the course of the project, the District awarded West Bay 56 days in time extensions, pushing the estimated date for project completion out to October 23, 2000. The project was not completed until September 25, 2001, or 393 days past the original completion date for the project. Subtracting the 56 days of time extensions awarded by the District, the project was delayed a total of 337 days until its completion.

From the beginning, the work fell behind the original schedule. The project was immediately beset by weather delays and problems associated with the District's design for the project. There were substantial delays in commencing and completing the foundation and framing, for which West Bay was responsible.

At trial, West Bay presented a "critical path" method to assess and assign blame for delays in the project. The United States Court of Claims offered this definition of "critical path" analysis in *Franklin L. Haney* (1982) 230 Ct.Cl. 148, 167–168 [676 F.2d 584, 595]: "Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.*, one could not carpet an area until the flooring is down and the

flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the 'critical path.' A delay, or acceleration, of work along the critical path will affect the entire project."

Out of the total of 393 days of delay on the project, West Bay's expert estimated that 65 of those days were attributable to Cummins as delays to the critical path. The expert estimated that 265 days of delay to the critical path were attributable to West Bay and others, but not to Cummins. The remainder of the delay was attributable to rain or project extensions granted by the District.

West Bay's expert divided the 65 days of critical path delay attributable to Cummins into three distinct "windows" or categories of delay. First, West Bay focused on a notice of noncompliance issued by the District's inspector on December 6, 1999, for noncomplying duct and conduit work performed by Cummins. Cummins corrected the duct and conduit work by December 15, 1999. West Bay's expert witness concluded that responding to the notice of noncompliance delayed critical path work 20 days, of which 10 were attributable solely to Cummins. Cummins disagreed that the work to correct the duct and conduit work affected the critical path, pointing out that the early start date for the underground electrical work was originally December 16, 1999, one day after Cummins completed the corrections to its work.

The second category of delay purportedly attributable to Cummins stemmed from a lack of manpower during late 2000. On August 11, 2000, West Bay sent Cummins a fax asking Cummins to provide additional manpower and advising that other trades were being delayed. West Bay's expert opined that Cummins's delay in "manning up" contributed 27 days of delay to the project's critical path.[1] Cummins disagreed with this assessment, arguing that the days of delay attributable to Cummins were not actual days but were instead the result of West Bay's decision to "resequence" the schedule. It was not until after the project was "resequenced" that the alleged delays materialized.

The third category of delay blamed on Cummins stemmed from one of Cummins's subcontractors, Ceintronics, which was engaged to install low

---

[1] Both West Bay and Cummins state that West Bay's expert attributed 33 days of delay to Cummins's alleged failure to man up. They neglect to note that the expert credited Cummins with six days on the schedule for making progress on manning the project. Thus, the net delay attributable to Cummins's manpower problems was 27 days.

voltage items such as the smoke alarms and speakers. After signing on to perform the low voltage work, Ceintronics experienced a significant increase in the cost of its labor. Ceintronics refused to man the job until the wage issue was resolved and Cummins agreed to pay the extra cost. On January 2, 2001, West Bay issued a 48-hour notice to Cummins to commence the low voltage electrical work or West Bay would hire another company to complete the work. Although Ceintronics ultimately completed the job, West Bay's expert attributed 28 days of delay to Cummins for the period from late 2000 to early 2001. Cummins disputed this assessment, claiming that installation of the fire alarm and other low voltage items was delayed because of excessive dust caused by the grinding of the concrete floors. The low voltage items could not be installed in such a dusty environment, according to Cummins's site foreman.

### The District settles with West Bay and releases retention proceeds

West Bay submitted monthly payment requests to the District in order to receive progress payments during the course of construction. Each progress payment request reflected amounts of work completed by West Bay as well as the subcontractors. Pursuant to the prime contract, the District was entitled to withhold 10 percent of each progress payment. The withheld 10 percent is referred to as "retention" or "retention proceeds." Retention proceeds were to be held by the District in an escrow account until the project was completed. In turn, West Bay had the right to withhold 10 percent from each subcontractor's progress payments.

After the project was completed, West Bay and the District disputed the amount owed under the prime contract as well as the proper disposition of the retention proceeds withheld by the District during the course of the project. The District identified roughly $190,000 in "disputed work" items that remained to be installed or repaired. The District also claimed the project was completed 337 days beyond the adjusted contract completion date, entitling the District to $337,000 in liquidated damages under the prime contract, or $1,000 for each day the project was delayed. The District's facilities director described the liquidated damages assessment as a "negotiable situation." West Bay filed a claim for additional compensation, seeking roughly $900,000 more from the District for delay costs incurred as a result of the District's changes and for extra work that West Bay performed.

In October 2002, West Bay settled its dispute with the District. Pursuant to the settlement, the District agreed to release the remaining retention proceeds ($516,606), thus paying West Bay the full amount of the original contract price. In addition, the District agreed to pay an additional $218,394 to West

Bay, composed in part of a final payment to settle the full amount of the adjusted contract price. The sum of $92,933 (out of the $218,394) represented the settlement of claims over and above the adjusted contract price. The settlement was predicated on an assessment of liquidated damages in the amount of $100,000. The settlement amounts were unaffected by this assessment because they had already been reduced to reflect the $100,000 offset for liquidated damages. Therefore, in the end, West Bay received the full, adjusted contract price plus over $92,000 to settle its claims.

The District released one-half of the retention proceeds to West Bay on October 26, 2001. The other one-half of the retention proceeds were released to West Bay on November 20, 2002, following the October 2002 settlement between West Bay and the District.

### *West Bay refuses to release retention proceeds to Cummins*

West Bay withheld $130,994 as retention from Cummins's progress payments. Public Contract Code section 7107, subdivision (d) generally provides that a subcontractor must be paid its share of retention proceeds within seven days from the time the original contractor receives all or any portion of the retention proceeds from a public agency. The original contractor may withhold from a subcontractor its portion of the retention proceeds, but only if a bona fide dispute exists between the subcontractor and the original contractor. (Pub. Contract Code, § 7107, subd. (e).) A contractor may not withhold more than 150 percent of the estimated value of the disputed amount. (*Ibid.*)

Although the District released one-half of the retention to West Bay in October 2001, and the balance in November 2002, West Bay did not pay Cummins its share of the released retention. West Bay claimed to believe that Cummins had delayed the critical path of the project by approximately 90 days. West Bay claimed it incurred liquidated damages imposed by the District as well as "general condition costs" associated with the delay. "General condition costs" represent the costs of remaining on the site, including expenses for phones, temporary power, toilets, rent for jobsite trailers, and salaries. West Bay estimated that it incurred $1,337 per day in general condition costs for each day of delay. Notwithstanding its claim that it incurred damages as a consequence of Cummins's delay, West Bay never provided any written accounting, itemized statement, or justification to Cummins as to why West Bay was refusing to release Cummins's share of the retention proceeds other than to tell Cummins it had delayed the project.

### *Cummins files stop notice*

On March 27, 2002, Cummins filed a "stop notice" for $145,674. A stop notice is a remedy to reach unexpended construction funds that remain in the

owner's hands. (See Civ. Code, § 3181.) Upon receiving the stop notice, the District withheld 125 percent of the amount specified in the notice from further progress payments to West Bay.

Civil Code section 3196 authorizes the issuance of a stop notice release bond. After the bond is posted, the claimant's remedies are limited to the bond and the public entity may no longer withhold money due the general contractor on account of the stop notice. (Civ. Code, § 3196; *Winick Corp. v. County Sanitation Dist. No. 2* (1986) 185 Cal.App.3d 1170, 1177–1178 [230 Cal.Rptr. 289].)

On April 1, 2002, West Bay obtained a stop notice release bond from Travelers Casualty & Surety Company of America, Inc. (Travelers). West Bay paid an annual premium of $1,821 to obtain and maintain the stop notice release bond.

### Cummins sues West Bay and Travelers

On February 6, 2003, Cummins sued West Bay for breach of contract and quantum meruit in the Alameda County Superior Court. Cummins alleged West Bay had breached the subcontract by failing to properly manage and supervise the project work. Cummins also alleged that West Bay had failed to pay on time and sought contract damages as well as statutory prompt payment charges. Alternatively, Cummins sought damages under a quantum meruit theory for the unpaid value of goods and services it had provided.

Cummins also sued Travelers to recover against the stop notice release bond. Cummins sought statutory prompt payment charges in addition to the unpaid contractual amounts.

### Cummins secures a judgment for $400,971

The matter proceeded to a jury trial. The trial court granted West Bay and Travelers's motion in limine to exclude all evidence regarding Cummins's claim arising from its stop notice because the court found the stop notice was not timely filed and was, therefore, void.[2] Following the presentation of Cummins's case, the court dismissed Travelers on Cummins's motion. After the close of evidence, the court on its own motion dismissed the cause of action for quantum meruit, leaving only the breach of contract cause of action against West Bay.

---

[2] To be effective, a stop notice must be filed within 30 days after the recording of a notice of completion. (Civ. Code, § 3184, subd. (a).) The notice of completion was recorded on October 15, 2001, but Cummins did not file its stop notice until March 27, 2002.

The jury returned a special verdict in favor of Cummins. The jury made the following findings: Cummins did all or substantially all of the significant things that the Cummins subcontract required it to do, including completing the Cummins subcontract in accordance with the contract documents and satisfactorily performing the work on the Cummins subcontract; West Bay failed to do something required by the Cummins subcontract and Cummins was harmed by that failure in the amount of $145,674; West Bay was not entitled to any offset against the damage award; West Bay failed to remit payment of retention proceeds to Cummins within seven days after it received retention proceeds from the District on October 26, 2001, and November 20, 2002; West Bay's withholding of the retention proceeds on both occasions was not based on a bona fide dispute; and Cummins's share of the retention proceeds received by West Bay on October 26, 2001, and November 20, 2002, was $65,497 on each occasion.

Cummins sought costs, attorney fees, and statutory prompt payment charges pursuant to the verdict, the Cummins subcontract's fee clause, and Public Contract Code section 7107, respectively. West Bay moved to tax costs and opposed the attorney fees and statutory charges motion. West Bay also moved for a new trial, asserting the damages were excessive, there was insufficient evidence to support the verdict, and the verdict was against the law. Among other things, West Bay asserted it was undisputed that it had incurred liquidated damages and general condition costs as a consequence of project delay. West Bay claimed it was entitled to a complete offset under the indemnity and damages for delay provisions of the Cummins subcontract. The court denied West Bay's motion for new trial.

The trial court entered judgment on the verdict, ordering West Bay to pay to Cummins unpaid retention of $130,994 and additional damages in the amount of $14,680, in accordance with the jury's verdict, plus $122,766 in attorney fees, $14,139 in costs, $114,139 in statutory prompt payment charges, and $4,253 in prejudgment interest, for a total judgment of $400,971.

**DISCUSSION**

**I., II.***

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 765.

### III. The Trial Court Properly Calculated the Statutory Prompt Payment Charges Imposed Under Public Contract Code Section 7107.

In its cross-appeal, Cummins challenges two aspects of the trial court's calculation of statutory prompt payment charges imposed under subdivision (f) of Public Contract Code section 7107 (hereafter section 7107(f)).[8] First, Cummins contends the court erred by concluding the 2 percent per month charge is not applied on a compounded basis. Second, it claims the court erroneously found the 2 percent per month charge stops accruing upon entry of judgment such that the retention proceeds withheld, plus any statutory charges accumulated through judgment, bear interest at the 10 percent per annum postjudgment rate. Because these arguments raise issues of statutory construction, we apply a de novo standard of review. (*People v. Morris* (2005) 126 Cal.App.4th 527, 535 [23 Cal.Rptr.3d 881].)

Section 7107 is one of a number of prompt payment statutes that subject project owners and prime contractors to "charges" or "penalties" for failing to timely remit progress payments or retention proceeds, absent adequate good faith justification.[9] (See §§ 7107, 10262.5; Bus. & Prof. Code, § 7108.5; Civ. Code, §§ 3260, 3320.) The purpose of the various prompt payment statutes is to serve a "remedial purpose: to encourage general contractors to pay timely their subcontractors and to provide the subcontractor with a remedy in the event that the contractor violates the statute." (*Morton Engineering & Construction, Inc. v. Patscheck* (2001) 87 Cal.App.4th 712, 720 [104 Cal.Rptr.2d 815].)

Section 7107(f) provides: "In the event that retention payments are not made within the time periods required by this section, the public entity or original contractor withholding the unpaid amounts shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due. Additionally, in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to attorney's fees and costs."

"Our primary task in construing a statute is to determine the Legislature's intent. [Citation.] We first turn to the words themselves for the answer.

---

[8] All further statutory references are to the Public Contract Code unless otherwise specified.

[9] West Bay points out that section 7107(f), unlike some other prompt payment statutes, does not include reference to a "penalty" but instead imposes a "charge." Although West Bay attempts to exploit this difference by arguing that a charge is more in the nature of interest than a penalty, it concedes the difference in terminology has limited significance. Our analysis does not turn on whether the 2 percent per month prompt payment fee is characterized as a "penalty" or a "charge."

[Citation.] When statutory language is clear and unambiguous there is no need for construction, and we will not indulge in it. [Citation.] We will not speculate that the Legislature meant something other than what it said. Nor will we rewrite a statute to posit an unexpressed intent. [Citation.] If the intent of the Legislature cannot be gleaned from the language of the statute, we may consider the legislative history of the statute. [Citations]." (*Morton Engineering & Construction, Inc. v. Patscheck, supra*, 87 Cal.App.4th at p. 716.)

With these principles in mind, we consider Cummins's contentions.

### A. *The 2 percent per month charge on unpaid retention proceeds is not compounded on a monthly basis.*

Cummins contends the plain language of section 7107(f) requires compounding of the prompt payment charges on a monthly basis because the 2 percent charge is applied "per month." According to Cummins, for every month that improperly withheld retention is not paid, the amount of the total debt increases by 2 percent, with the statutory charge applied to the total amount of the unpaid retention plus the accrued charges. Cummins asserts that the trial court's interpretation of section 7107(f) essentially omits the reference to "per month" and rewrites the statute to conform to "per annum" language found in prejudgment and postjudgment interest statutes.

■ The plain language of the statute does not support Cummins's interpretation. Section 7107(f) requires "a charge of 2 percent per month on the *improperly withheld amount,* in lieu of interest otherwise due." (Italics added.) The statute's reference to the "improperly withheld amount" is plainly to the sum "improperly withheld"—i.e., the withheld retention payments. Nothing in the statute suggests, much less requires, that the prompt payment charge becomes a part of, or is added to, the "improperly withheld amount." For example, the statute does not refer to the "total amount due" or similar language that would indicate that the "improperly withheld amount" includes accrued prompt payment charges.

We are aware of no reported cases addressing whether prompt payment charges in statutes analogous to section 7107 are calculated on a compounding monthly basis. The issue appears to be one of first impression. However, we are guided in our analysis by the decision in *Schuhart v. Pinguelo* (1991) 230 Cal.App.3d 1599 [282 Cal.Rptr. 144] (*Schuhart*), in which Division One of this court addressed a dispute over the amount of penalties owed on unpaid and delinquent assessment bonds.

At issue in *Schuhart* was whether Streets and Highways Code former section 6442, which at the time imposed a 1 percent per month penalty on "the total amount of such delinquency," also authorized compounding.[10] (*Schuhart, supra*, 230 Cal.App.3d at p. 1607.) The appellate court found the statute did not authorize compounding, explaining that the statute "scrupulously maintains a distinction between penalties and delinquent payments," contains "no expression of an intent to compound penalties," and "instead indicates the Legislature's intent to impose a 1 percent penalty on the amount of delinquent principal and/or interest each month." (*Id.* at p. 1608.) The court reasoned that merging the monthly penalty charges into the delinquent amount would change the meaning of the term "such delinquency" once penalty charges were added to the original amount of the delinquency. The court could find no basis on which to attribute a different meaning to the statutory term after penalty charges were imposed. (*Ibid.*)

Even though the statute's language was arguably ambiguous, the *Schuhart* court continued, it did not authorize compounding. (*Schuhart, supra*, 230 Cal.App.3d at pp. 1608–1609.) The court noted that the plaintiff had "failed to cite a single statute or case that authorizes compounding of penalties," and explained that "[p]enalties and forfeitures are not favored by the courts, and statutes imposing penalties or creating forfeitures must be strictly construed. [Citations.]" (*Id.* at p. 1610.) Thus, the court held that the Legislature could not have intended compounding, because its intention " 'should not be presumed to include harsh or absurd results unless the language is so clear as to admit of no doubt. [Citations].' [Citation.]" (*Id.* at p. 1609.)

Here, the term "improperly withheld amount" in section 7107(f) refers to retention payments that a contractor or owner fails to make within the time periods elsewhere discussed in section 7107. As in *Schuhart,* the statute scrupulously maintains a distinction between the "withheld amount" and the "charge," and contains no expression of an intent to compound or to increase the "improperly withheld amount" by the amount of the "charge" on a monthly basis. The statute contains no indication that the term "improperly withheld amount" has a changed meaning with each successive month that prompt payment charges are applied. Thus, section 7107(f) authorizes a charge only for the improperly withheld amount rather than that amount plus any accrued but unpaid charges.

■ Our conclusion would remain the same even were we to think the statute ambiguous as to whether to apply charges on a compounding basis.

---

[10] The statute presently allows for a 2 percent per month penalty. (Sts. & Hy. Code, § 6442.)

Reading section 7107(f) to permit compounding would produce harsh and absurd results without any indication that the Legislature intended them. Here, the noncompounded charge was $114,139 by the time of judgment. Compounding the charges would have produced a total charge of $170,029.38, adding nearly $56,000 to the charges the trial court imposed. This additional sum is close to half of the total amount improperly withheld. In cases where complex construction litigation extends for years until a judgment is rendered, the discrepancy caused by compounding would be even greater. Because the language of section 7107(f) is hardly so clear as to admit of no doubt that the Legislature intended such harsh results, we will not read the statute to permit compounding of the 2 percent prompt payment charge.

### B. *The 2 percent per month charge does not accrue after entry of judgment.*

Cummins claims the 2 percent per month charges continues to accrue after entry of judgment, asserting that the plain language of section 7107(f) imposes the charge in lieu of *any* interest otherwise due. Cummins points out the statute does not distinguish between prejudgment interest and postjudgment interest, and does not indicate the charges cease accruing upon entry of judgment.

West Bay argues that the charge is in the nature of interest, which under the California Constitution is capped at a rate of 10 percent after entry of judgment. (Cal. Const., art. XV, § 1; see also Code Civ. Proc., § 685.010, subd. (a).) We agree.

■ The California Constitution specifies that "[t]he rate of interest upon a judgment rendered in any court of this State shall be set by the Legislature at no more than 10 percent per annum." (Cal. Const., art. XV, § 1.) "This section is a limitation on the power of the Legislature to set postjudgment interest rates [and] sets a ceiling that the Legislature cannot exceed. [Citation.]" (*Westbrook v. Fairchild* (1992) 7 Cal.App.4th 889, 893 [9 Cal.Rptr.2d 277], fn. omitted.)

■ "Whenever possible, statutes are to be interpreted as consistent with applicable constitutional provisions so as to harmonize both. [Citation.] Thus, 'legislation is presumptively constitutional and all doubts are to be resolved in favor of its validity. [Citations.]' [Citation.] 'A statute should be judicially construed in such a manner to avoid unconstitutional results. [Citations.]' [Citation.]" (*Mendez v. Kurten* (1985) 170 Cal.App.3d 481, 485 [215 Cal.Rptr. 924] (*Mendez*).)

In *Mendez*, the appellate court considered whether it was appropriate to award interest on a judgment pursuant to both Code of Civil Procedure section

685.010, subdivision (a), which allows for postjudgment interest to accrue at 10 percent per annum, and Civil Code section 3291, which also allows for interest to accrue at 10 percent per annum if the conditions of the statute are met. (*Mendez, supra,* 170 Cal.App.3d at pp. 484–485.) Civil Code section 3291 generally provides that, when a personal injury plaintiff obtains a judgment more favorable than a statutory offer to compromise made pursuant to Code of Civil Procedure section 998 but rejected by the defendant, the ensuing judgment bears an interest rate of 10 percent per annum calculated from the date of the first statutory offer to compromise that is exceeded by the judgment. Notably, like Code of Civil Procedure section 685.010, Civil Code section 3291 provides that interest accrues under the statute until the judgment is satisfied. Applying both statutes, the trial court in *Mendez* permitted the plaintiff to obtain 20 percent interest on the judgment following its entry. (*Mendez, supra,* 170 Cal.App.3d at p. 484.)

The appellate court reversed, holding that "the Legislature did not intend, and the California Constitution does not allow, interest to be cumulatively awarded pursuant to both sections between entry of judgment and its satisfaction." (*Mendez, supra,* 170 Cal.App.3d at p. 483.) Even when Civil Code section 3291 applies, interest on a judgment is limited to 10 percent simple interest calculated from the date of the judgment's entry until its satisfaction. (*Mendez, supra,* 170 Cal.App.3d at p. 487.) The plaintiff in *Mendez* sought to avoid the limitation on postjudgment interest, arguing that the "interest" allowed by Civil Code section 3291 was " 'in the nature of damages' " and was therefore unaffected by the constitutional provision limiting postjudgment interest. (*Mendez, supra,* 170 Cal.App.3d at p. 486.) The appellate court disagreed, pointing out that such an interpretation would mean that "damages" would continue to accrue until the judgment was satisfied, a result in conflict with Code of Civil Procedure section 577.5, which requires that a judgment be expressed as a specific sum of money.[11] (*Mendez, supra,* 170 Cal.App.3d at p. 487.)

Here, the question is whether the section 7107(f) charge is subject to the constitutional limitation on the interest rate that may be assessed on a judgment. Section 7107(f) does not describe the 2 percent per month charge as "interest," although it does clarify that the charge is imposed "in lieu of any interest otherwise due." While not denominated as "interest," the section 7107(f) charge is assessed in the same manner as interest, i.e., as a cost that is calculated on a periodic basis as a percentage of a principal amount. The section 7107(f) charge plainly becomes the equivalent of postjudgment interest to the extent it is assessed on all or any portion of a judgment in lieu

---

[11] Code of Civil Procedure section 577.5 provides: "In any judgment, or execution upon such judgment, the amount shall be computed and stated in dollars and cents, rejecting fractions."

of statutory postjudgment interest. As such, to the extent section 7107(f) applies after entry of judgment, it is subject to the constitutional 10 percent limitation on postjudgment interest. (Cal. Const., art. XV, § 1.)

If we were to endorse Cummins's interpretation of section 7107(f), we would essentially be adopting a position that permits the Legislature to skirt the limitations of article XV, section 1 of the California Constitution by denominating a usurious postjudgment interest rate as either a penalty or a prompt payment charge. By allowing prompt payment charges to accrue after entry of judgment here, we would in effect be allowing Cummins to receive 24 percent per annum interest on a substantial portion of the judgment, an amount more than twice that permitted by the Constitution. Such a result is in plain contravention of the Constitution's limitation on interest that may be imposed after judgment, even though the Legislature chose to call the 2 percent per month rate a "charge" instead of "interest."

An interpretation of section 7107(f) allowing postjudgment accrual of charges also cannot be reconciled with statutes governing the calculation and satisfaction of judgments. Code of Civil Procedure section 695.210 provides that the amount required to satisfy a money judgment is (1) the amount of the judgment as entered, (2) plus costs pursuant to Code of Civil Procedure section 685.090, (3) plus postjudgment interest pursuant to Code of Civil Procedure sections 685.010 through 685.030, (4) minus any amounts already paid or no longer enforceable. The postjudgment accrual of section 7107(f) charges does not fit into any of these categories. It is not part of the judgment as entered, nor is it appropriate to add the charges to the judgment as additional "damages" after entry of the judgment. (See *Mendez, supra,* 170 Cal.App.3d at p. 487; Code Civ. Proc., § 577.5.) The section 7107(f) charge is also not a cost that may be recovered by statute. (Code Civ. Proc., § 685.070.) It is also not postjudgment interest as described in Code of Civil Procedure sections 685.010 through 685.030.[12] Thus, as reflected in statutes governing the calculation and satisfaction of judgments, the Legislature did not antici- pate that statutory penalties or charges would continue to accrue after a judgment is entered, except to the extent such charges are specifically recoverable as costs pursuant to Code of Civil Procedure section 685.070.

We conclude that the 2 percent per month charge assessed under section 7107(f) ceases to accrue upon entry of judgment. Not only is this interpreta- tion of section 7107(f) consistent with other statutes governing judgments, but it also allows us to harmonize the statute with the constitutional restric- tion on postjudgment interest. Cummins is entitled to receive interest on the amount of its judgment, but not at a rate exceeding 10 percent simple interest.

---

[12] Of course, to the extent the charge is characterized as postjudgment interest, it would be subject to the constitutional limitation on the interest rate applied after entry of judgment.

## DISPOSITION

The judgment is affirmed. Each party shall bear its own costs on appeal.

Pollak, J., and Horner, J.,[*] concurred.

A petition for a rehearing was denied February 29, 2008.

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.