Filed 3/2/21  Salsbury Engineering, Inc. v. Consolidated Contracting Services, Inc. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SALSBURY ENGINEERING, INC., | |
| Plaintiff, Cross-defendant and Appellant, | G057832 (Consol. with G057966) |
| v. | (Super. Ct. No. 30-2015-00789263) |
| CONSOLIDATED CONTRACTING SERVICES, INC., | O P I N I O N |
| Defendant, Cross-complainant and Respondent. | |

Appeal from a judgment and order of the Superior Court of Orange County, Craig L. Griffin, Judge.  Affirmed.

Mahoney & Soll, Paul M. Mahoney and Richard A. Soll for Plaintiff, Cross-defendant, and Appellant.

Snell & Wilmer, Michael J. Baker, Todd E. Lundell and Marshall J. Hogan for Defendant, Cross-complainant, and Respondent.

## INTRODUCTION

We venture here into the labyrinthine world of large-scale construction projects – in this case, the Jeffrey Open Space Trail (JOST), a miles-long linear park "run[ning] down the spine" of north Irvine. The property on which JOST sits was owned by Irvine Community Development Company, LLC (the owner). It was developed between 2012-2015 for eventual use by the City of Irvine as a public recreational space.

The dispute before us revolves around interpretation of the prompt payment statutes, a category of laws requiring "'general contractors to pay their subcontractors within specified, short time periods,'" or face "'monetary penalties for violations.' [Citations.]" (See *FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 795.) Specifically, we deal with Civil Code section 8814[1], a statute which only two years ago was the subject of the California Supreme Court's ruling in *United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082 (*United Riggers*). Section 8814 provides for prompt payment penalties when contractors fail to timely pay retentions to their subcontractors. "'Retention proceeds or retention payments are "payments relating to work already done but which are not presently paid, which instead are withheld until completion of 100 percent of the [contractor's] work."' [Citation.]" (*Yassin v. Solis* (2010) 184 Cal.App.4th 524, 535 (*Yassin*).) Today, we decide a subcontractor is not entitled to prompt payment penalties under section 8814 when the trier of fact decides it has not completed the work.

The general contractor on the JOST project, respondent Consolidated Contracting Services, Inc. (Consolidated) withheld from its grading subcontractor, appellant Salsbury Engineering, Inc. (Salsbury), retention payments it received from the owner at the completion of three segments of the project. Among other things, Salsbury contended it should have received its retention money on the first two segments, even

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

though it did not complete its work on the third. A jury found Salsbury was owed payment for work done on the first two segments but Consolidated was owed damages due to Salsbury's failure to complete the third. The prompt payment issue was left to the court to decide after the verdict. It ruled in Consolidated's favor and found it was the prevailing party for purposes of contractual attorney fees. We agree and affirm.

## FACTS

JOST was a complex project containing numerous features, including running trails, bike paths, an amphitheater with restrooms, benches, a few bus stops, and swales for drainage. It was originally developed as part of the construction of three housing developments in Irvine – Cypress Village, Woodbury, and Stonegate. A segment of JOST was attached to each of the three housing tracts, and was "mass grad[ed]" to a "rough-grade condition" at the time the tracts were constructed.[2] The significance of these segments – called Segments 1, 2, and 3 of JOST - would later become central to the parties' debate in this case.

*Consolidated Becomes General Contractor*

The owner had Stice Grading (Stice) do the mass grading work on the segments in late 2012 and early 2013. Once that was done, the owner set about developing JOST, ultimately engaging Consolidated as general contractor. Consolidated priced out and bid the project in its entirety over all three segments, including grading, concrete, masonry, electrical, and other work.[3]

Sometime around July 2013, Consolidated and the owner signed three prime contracts, one for each segment. The record before us contains what appears to be the prime contract for Segment 3, entitled "ICDC – Contractor Construction Contract."

---

[2]    Mass grading, sometimes called rough grading, refers to the process of grading the ground for a construction project on a larger scale, using larger equipment. It is to be differentiated from precise grading or finish grading, which uses smaller equipment to accomplish a finished grade in order to receive the construction work.

[3]    Consolidated's founder and CEO, Tony Elias-Calles, testified landscaping was not within Consolidated's scope of work. It was directly bid out by the owner.

The scope of work for the contract seems to relate only to Segment 3, though the specifications attached to it relate to the JOST project as a whole. The contract had a provision allowing the owner to terminate Consolidated if it defaulted on its obligations. In such a case, and to the extent it was a "multi-phase project," the owner could elect to "reduce the Work to be performed under th[e] Contract and such other contracts by [Consolidated] to the phase or phases then in progress, in which event" the contract itself and contracts relating to subsequent phases would "become null and void." If it chose to terminate the contract, the owner had "the right to offset against payments due [Consolidated] under th[e] Contract and any other contracts between [them], such amounts as may be reasonably necessary to protect [the owner] against Loss anticipated by" the owner as a result of the default.

*Consolidated Hires Salsbury to Do Precise Grading*

Salsbury, a grading and excavating contractor, in turn, entered into three separate subcontracts with Consolidated in August 2013 to perform grading and demolition on Segments 1 through 3. Specifically, the parties agreed Salsbury would perform grading and demolition on Segment 1 for $181,995; grading on Segment 2 for $49,462; and grading and demolition on Segment 3 for $116,338. The prime contracts with the owner were incorporated into the subcontract documents and Salsbury assumed toward Consolidated all the same "obligations, rights, duties, and redress" that Consolidated assumed toward the owner. The converse was also true – if the owner had any rights as against Consolidated in the prime contracts, Consolidated had those same rights as against Salsbury. Presumably, then, Consolidated had the same rights the owner had regarding termination of the contractual relationship. The subcontracts also provided for a 10 percent retainage of payments received by Consolidated from the owner for Salsbury's work.

4

*Salsbury's Performance*

Salsbury began work on Segment 1 in November 2013 and completed it without any complaints or criticisms. It began work on Segment 2 a few months after Segment 1, and again, completed it without any complaints or criticism. Once it reached Segment 3, however, Salsbury encountered difficulties in achieving the desired grade.[4] These difficulties reached their tipping point in July 2014. The owner informed Consolidated it was out of time – either Salsbury had to achieve a certified precise grade immediately or the owner would take over the grading.

The characterization of what occurred next was the subject of dispute at trial. Consolidated felt it had to thread the needle. It brought Stice back to complete the work in order to appease the owner, who had lost confidence in Salsbury, but there were legitimate issues with the site conditions, so Consolidated wanted to give Salsbury the opportunity to continue to participate by observing and consulting on Stice's work. Salsbury, on the other hand, felt it was being suspended and/or terminated from the remainder of its work, and it had no interest in observing another subcontractor – a "competitor" – complete it. Regardless of the characterization, all agree Salsbury performed no more work on JOST after July 2014.

Stice completed the grading scope of work in mid-September 2014. The owner recorded a notice of completion for Segments 1 and 2 on April 30, 2015, and one for Segment 3 on June 11, 2015. JOST being complete, Consolidated applied for final payment from the owner, including all of the retainage withheld from progress payments throughout the project. It was paid the full amounts it was owed on all segments, but it withheld any further payment to Salsbury, including payments still owed on Segments 1

---

[4] Though much time was spent – quite understandably – at trial elaborating on the complications encountered in Segment 3 of the work, and who was responsible, the details are largely irrelevant to the issues we must decide and we need not delve into them here.

and 2 and Salsbury's retentions on all segments of the project. It surmised Salsbury had not completed the project as a whole and thus should not recover its retentions.

*The Lawsuit*

Salsbury filed three separate complaints (for breach of each segment's subcontract), common counts, and quantum meruit. Each complaint sought a 2 percent penalty on all improperly withheld amounts under the applicable prompt payment statute.[5] The cases were – no pun intended – consolidated. Consolidated also cross-complained against Salsbury because of the issues with Segment 3. The case went to a lengthy trial.

During closing arguments but outside the presence of the jury, counsel and the trial judge discussed the content of the verdict forms. Salsbury's counsel wanted to ask the jury whether Consolidated withheld in good faith amounts it owed Salsbury as a way of assisting the court in determining prompt payment penalties under section 8814. The trial court cautioned that might cause the jury to decide one part of the issue while the court decided the other. Counsel for both parties shared that concern, and ultimately, they decided to have the court rule on the prompt payment issue in its entirety. The jury would only decide how much was owed to whom, if anything, on each contract. The court would determine whether any offset should be applied.

After deliberating, the jury decided Salsbury was owed $124,363.13 on Segment 1 and $9,108.70 on Segment 2. However, it found in favor of Consolidated on Segment 3, awarding it $260,258.70, or roughly half of what Consolidated sought in its cross-complaint. Once the verdicts were handed down, the prompt payment issue was briefed and heard. Adopting Consolidated's framing of the contract documents, the court

---

5        The complaints specifically identify Civil Code sections 3260 and 3260.1 as the applicable prompt payment statutes. These were among a group of statutes repealed in 2010 and replaced by Part 6 of Division 4 of the Civil Code. (See Cal. Law Revision Com. com., West's Ann. Civ. Code foll. § 3260.) We presume Salsbury intended to refer to section 8814, the "language" of which "originated" in the repealed section 3260. (See *United Riggers*, *supra*, 4 Cal.5th at p. 1093.)

6

denied Salsbury's request for prompt payment penalties as to Segments 1 and 2. It concluded the three subcontracts were part of one integrated project and because the parties had assumed the rights and obligations of the prime contract, Consolidated was entitled to offset losses on one segment against Salsbury's right to payment on others in the event of its default. Contrary to Salsbury's contention, the trial court did not think the holding of *United Riggers* required the imposition of prompt payment penalties against Consolidated. After moving unsuccessfully for new trial, Salsbury filed the first of its two appeals. It filed the second after the trial court denied its motion for attorney fees as to Segments 1 and 2 and granted Consolidated contractual attorney fees and costs because the contracts were interrelated and Consolidated was the prevailing party as to the project as a whole. We consolidated the appeals for hearing and decision.

## DISCUSSION

The parties' arguments on appeal are protracted and numerous, but to resolve this appeal, we isolate only three key issues. First, was Salsbury entitled to prompt payment penalties on Segments 1 and 2 even though it did not complete Segment 3? Second, did Consolidated's contractual right of offset immunize it from liability under section 8814? Third, was the trial court correct to award prevailing party attorney fees to Consolidated under the contracts? Because we answer the first question in the negative, we need not decide the second. As to the third, we affirm.

**I.        Standard of Review**

The question regarding prompt payment penalties presents us with a mixed question of law and fact. To the extent we are interpreting section 8814 and related statutes, our review is independent. (See *S&S Cummins Corp. v. West Bay Builders, Inc.* (2008) 159 Cal.App.4th 765, 777.) However, we apply a substantial evidence standard where our analysis turns on disputed facts, including the interpretation of a contract where the parties present conflicting extrinsic evidence. (See *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 866.) We review the trial court's prevailing

7

party determination for abuse of discretion. (See *City of West Hollywood v. Kihagi* (2017) 16 Cal.App.5th 739, 753.)

**II.        Prompt Payment Penalties**

Section 8814 is part of a class of prompt payment statutes dealing with retentions "withheld by an owner from a direct contractor or by a direct contractor from a subcontractor." (See § 8810.) It is important to distinguish retentions from payment for work performed under the contract in question. As we foreshadowed in the introduction, "[r]etention amounts are a form of security generally retained by the owner from prior payments due for work previously performed. [¶] Authorities have noted that a retention occurs when the owner retains a percentage from each progress payment as a form of security against potential mechanics' liens and as security that the contractor will complete the work properly and repair defects." (*Yassin*, *supra*, 184 Cal.App.4th at pp. 533-534.) "The withholding of retention payments provides the contractor with incentive to complete the work, while reducing the owner's risk of the contractor's nonperformance." (*Id.* at p. 535.) The retention is released when the project is complete and any potential lien claims are resolved; that is, when there is no longer a need for any security against the contractor's nonperformance or defective performance. (See *id.* at pp. 534-535.)

Since the purpose of retentions is to secure a contractor's complete performance, it necessarily follows that a contractor must *actually complete* the work in order to receive those sums back. The process usually begins with the owner of the construction project paying the retention to the direct contractor "within 45 days after completion of the work of improvement." (§ 8812, subd. (a).) The direct contractor (in this case, Consolidated) must in turn "pay to each subcontractor from whom retention has been withheld that subcontractor's share of the payment" within 10 days after it receives the retention back. (§ 8814, subd. (a).)

8

Salsbury contends it never received the retention on Segments 1 and 2, even though Consolidated received it from the owner. But Consolidated only began receiving it from the owner in May 2015. This was nearly a year after Salsbury had left the job without completing its work on Segment 3. Was Salsbury entitled to get its retention back after it left the job?[6] Seemingly aware of the poor optics of such a request, Salsbury's solution has always been to contend each of the segments was itself a separate project. But the parties' conduct controls. (See *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 752-753.) Salsbury completed work on Segments 1 and 2 before moving on to Segment 3, but no notices of completion were recorded as to that work until April 2015. The retainage deducted from Salsbury's pay applications for work on Segments 1 and 2 was not returned as soon as it completed work on those segments. And perhaps most strikingly, the owner was not willing to release retention *to Consolidated* until the entire JOST project was complete in the spring of 2015.

All of this is compelling evidence supporting the trial court's view of the JOST project as a single, integrated whole, even though a separate contract was signed as to each segment. (See § 1642.) The "work" here was all three segments, and not just any one segment. Accordingly, Salsbury could not get its retention back unless it completed the entire project. It did not complete the entire project, and in fact, Stice had to complete its work at significant expense to Consolidated. Under these circumstances, we cannot see how Salsbury was entitled to return of the retention at all, let alone prompt payment penalties on those sums.[7] While prompt payment statutes like section 8814 are remedial in protecting subcontractors like Salsbury, retentions are designed to protect contractors like Consolidated in the very circumstance present here.

---

[6]     We realize Salsbury felt it was unfairly terminated from the project. But the jury resolved the issues of liability related to Segment 3 in Consolidated's favor, and Salsbury has not challenged the jury's determination in that regard.

[7]     Because of this conclusion, we need not reach the parties' arguments as to Consolidated's purported good faith or lack thereof in withholding retention from Salsbury, and specifically whether Consolidated's conduct was improper under *United Riggers*.

## III. Attorney Fees

Salsbury also protests the trial court's award of contractual attorney fees to Consolidated. It first argues it was entitled to recover fees for Segments 1 and 2 as a prevailing party on those subcontracts – even though it did not prevail on the Segment 3 claim – because the subcontracts were to be construed separately. (See *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464 (*Arntz*); *Hunt v. Fahnestock* (1990) 220 Cal.App.3d 628, 631-632 (*Hunt*).) In the alternative, it believes the trial court should have found there was no prevailing party at all.

The trial court sensibly rejected Salsbury's first argument as a necessary corollary of its characterization of JOST as one integrated project – a characterization with which we have already indicated our agreement. If the contracts were not to be construed separately for purposes of prompt payment penalties, they should not be construed separately for purposes of attorney fees. And our review of Salsbury's cited authorities reinforces such a conclusion.

The attorney fee award in *Arntz* was predicated on two independent agreements between a general contractor and its surety, St. Paul Fire & Marine Insurance Company. The first was a set of third-party indemnity agreements executed in 1980 at the inception of the parties' relationship. (*Arntz*, *supra*, 47 Cal.App.4th at pp. 471-472.) The second was called the "Collateral Agreement," and was signed four years later.

*Arntz*, like our case, involved a construction project – a Richmond public housing project called Triangle Court. (*Arntz*, *supra*, 47 Cal.App.4th at p. 471.) Plaintiff Arntz secured the general contract with the City of Richmond in 1982. Because it was a public works project, Arntz had to post bonds, which it had St. Paul issue. (*Ibid.*) The project soon ran into numerous problems, causing the city to terminate Arntz and demand St. Paul obtain substitute performance to complete it. (*Id.* at p. 472.) Because of their amicable relationship, however, St. Paul and Arntz continued to meet to figure out how the project could get done with Arntz at the helm. They found a new contractor and

10

agreed Arntz could retain essential control. But St. Paul required Arntz to pledge $1 million in collateral to continue bonding them. (*Id.* at p. 473.) Ultimately, this arrangement fell apart as well and St. Paul scrapped everything, found a completely new contractor, and completed the project without Arntz.

Arntz sued for breach of the collateral agreement, arguing St. Paul had failed to provide bonding as required. St. Paul sought contractual indemnification under the 1980 indemnity agreements for its costs in completing the project. The action was tried to a jury in three phases – the first two pertaining to St. Paul's indemnity claims, and the third to Arntz's breach of contract and tortious interference claims. (*Arntz, supra,* 47 Cal.App.4th at p. 474.) Both sides won something. After offsets, St. Paul was awarded $813,000, and Arntz $16.5 million in compensatory damages. The trial court awarded Arntz attorney fees and costs from all phases of the trial and St. Paul sought, *inter alia,* reversal of the attorney fee award.

The First District Court of Appeal concluded the trial court erred in awarding fees for all three contracts to Arntz because the Collateral Agreement and the third-party indemnity agreements were "separate" and could not be "read as a single contract." (*Arntz*, *supra*, 47 Cal.App.4th at p. 490.) While the Collateral Agreement incorporated the third-party indemnity agreements, that "did not destroy the independence of the third party indemnity agreements and merge them into a single contract with the Collateral Agreement." (*Ibid*.) The court further stated: "When an action involves multiple, independent contracts, each of which provides for attorney fees, the prevailing party for purposes of Civil Code section 1717 must be determined as to each contract regardless of who prevails in the overall action." (*Id.* at p. 491.)

*Arntz* did involve multiple, independent contracts. The first was signed at the beginning of the parties' overall relationship before there ever was any Triangle Court project. The second was signed two years after the Triangle Court project began, and after problems had arisen on it. To view them as an integrated whole would require the

11

logical equivalent of a Kierkegaardian leap. Even if the later contract incorporated the earlier contract, that did not make it an amendment, or merge it into the original agreement.

In contrast, the contracts Salsbury attempts to separate were signed within days of one another and they all relate to the JOST project, albeit different segments of it. The owner's representative testified the three agreements grew out of the owner's desire to keep the segments separate for accounting purposes so expenses could be connected to the separate housing developments abutting the segments. It is eminently reasonable to view them as an integrated whole.

The *Hunt* case is also distinguishable. There, the trial court had ruled the three contracts in question were independent obligations, and the appellant did not challenge that ruling. (*Hunt*, *supra*, 220 Cal.App.3d at p. 631.) The Court of Appeal highlighted the trial court's "broad discretion in determining the prevailing party to a contract," and the rule requiring it to "defer to the trial court's decision unless it [wa]s unreasonable." (*Id.* at p. 633.) Here we must do the same.

We conclude similarly that it was also reasonable for the trial court to reject Salsbury's other suggestion: finding no prevailing party.[8] Both parties sought attorney fees pursuant to section 1717, which permits the court to determine the prevailing party for purposes of attorney fees if the parties move for such a determination. Under this section, "the party prevailing on the contract shall be the party who recovered a greater

_____

[8]     It is possible an argument could have been made that Consolidated's motion never formally established the right to contractual attorney fees by the terms of the subcontracts, because the right to attorney fees in paragraph 11.6 of the subcontracts is subject to a condition precedent as to which we have no evidence of compliance. Article 11 of the subcontracts is entitled "Dispute Resolution." It provides for a multi-step process to resolve disputes, beginning with "direct discussions" and advancing, if necessary, to mediation prior to "binding dispute resolution." Importantly, paragraph 11.1 of Article 11 states "[e]ngaging in mediation is a mandatory condition precedent to any other form of binding dispute resolution and to institution of litigation." We do not know whether mediation was attempted prior to litigation. This issue must go unresolved because it was not raised in the parties' briefing.

relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section." (§ 1717, subd. (b)(1).)

"'[I]n deciding whether there is a "party prevailing on the contract," the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. The prevailing party determination is to be made *only upon final resolution of the contract claims* and only by "a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions."' (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876, italics added [(*Hsu*)].)" (*Roberts v. Packard, Packard & Johnson* (2013) 217 Cal.App.4th 822, 834.)

"'"When a trial court has resolved a disputed factual issue, an appellate court reviews the ruling according to the substantial evidence rule. The trial court's resolution of the factual issue must be affirmed if it is supported by substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) We look at the evidence in support of the trial court's finding, resolve all conflicts in favor of the respondent and indulge in all legitimate and reasonable inferences to uphold the finding.' (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1290.)" (*Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 378.)

"As one Court of Appeal has explained, '[t]ypically, a determination of no prevailing party results when both parties seek relief, but neither prevails, or when the ostensibly prevailing party receives only a part of the relief sought.' (*Deane Gardenhome Assn. v. Denktas* (1993) 13 Cal.App.4th 1394, 1398.)" (*Hsu, supra*, 9 Cal.4th at pp. 875.) This was the situation in *McLarand, Vasquez & Partners, Inc. v. Downey Savings & Loan Assn.* (1991) 231 Cal.App.3d 1450 (*McLarand*), the case cited by Salsbury. In *McLarand*, neither side received any relief.

"By contrast, when the results of the litigation on the contract claims are not mixed – that is, when the decision on the litigated contract claims is purely good

13

news for one party and bad news for the other – the Courts of Appeal have recognized that a trial court has no discretion to deny attorney fees to the successful litigant. Thus, when a defendant defeats recovery by the plaintiff on the only contract claim in the action, the defendant is the party prevailing on the contract under section 1717 as a matter of law." (*Hsu*, *supra*, 9 Cal.4th at pp. 875-876.)

This case does not fit squarely into the categories articulated by the California Supreme Court in *Hsu*. There was no lopsided result. Consolidated did not receive all of the relief it sought, and neither did Salsbury. This meant the trial court had discretion to use any of the options available to it under section 1717. And it chose to find Consolidated the sole prevailing party. In doing so, it made two determinations which cut decidedly against Salsbury's position. First, it determined there was one integrated contract, rather than three separate ones. It was therefore reasonable for the trial court to choose one prevailing party on the contract. Second, even if the three contracts were separate, the trial court observed Consolidated had received a net win on its cross-claims. Thus, the trial court concluded Consolidated met section 1717's requirement – it recovered greater relief on the integrated contract. We see no abuse of discretion in that methodology.

14

## DISPOSITION

The judgment is affirmed.  Respondent to recover its costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


ARONSON, J.


GOETHALS, J.