177 Cal.App.4th 138 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
QUANG MINH TRAN, Defendant and Appellant.
No. G036560.
Court of Appeals of California, Fourth District, Division Three.
August 31, 2009.
*143 Marleigh A. Kopas, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steve Oetting and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
SILLS, P. J.

I. INTRODUCTION
Three members of two Vietnamese gangs aligned with each other entered an apartment complex in search of a particular member of a rival Vietnamese gang who call themselves the "Oriental Play Boys." They found the rival gang member in a parking lot. When the rival gang member fled, one of the assault team, appellant Quang Minh Tran, shot at him and missed. Two of the team then bumped into an innocent bystander, carrying groceries. Tran exclaimed, mistaking the bystander for a member of the rival gang, "Hey, that's Play Boy." Then, as the bystander fled, Tran crouched on the sidewalk, took aim, and shot him.
This time his aim was better. The shot went through the bystander's back, exited his abdomen, then lodged in his arm. The bystander bled to death. When Tran learned a month later that the bystander was innocent of affiliation with the rival gang, he said, "Fuck it, like oh well."
Tran was later caught, tried, and sentenced. The constituent parts of his sentence are:
*144 (1) 25 years to life for the murder of the bystander.
(2) 10 years for use of a firearm in the bystander's murder (the upper term).
(3) 3 years for a gang enhancement.
(4) Life with possibility of parole for the attempted murder of the rival gang member.
(5) 10 years for use of a firearm in the attempted murder of the rival.
(6) 3 years for a gang enhancement on the attempted murder.
(7) And the upper term of 3 years for street terrorism.
All parts of the sentence are to run consecutively. Adding up the numbers for everything except the life-with-possibility-of parole term for the attempted murder results in a sentence of 54 years to life, at which point Tran can begin his life sentence with the possibility of parole.
In this appeal, Tran raises these six basic[1] issues:
(1) An Evidence Code section 352 challenge to evidence that Tran and three other fellow gang members had been involved in a series of protection racket extortions of Vietnamese businesses in 1993 and 1994 on behalf of the gang.
(2) An Evidence Code section 352 challenge occasioned by a gang member witness's blurting out the fact that his sister had been "executed."
(3) A charge of juror misconduct based on trial counsel's affidavit that she had spoken to some of the jurors after the trial and one had said he believed in caning for recidivists.
*145 (4) The question of whether the three years for the street terrorism conviction punished Tran for the same acts as the murder and attempted murder. (See generally Pen. Code, § 654.)[2]
(5) A Cunningham[3] challenge to the court's use of upper terms and consecutive sentences based on some factsprior convictions and prison sentences as an adultthat had not been found by the jury.
(6) A challenge to the trial court's use of consecutive sentences based on the use of a gun, when the use of a gun already had been used to impose gun enhancements.
All but one of these arguments ultimately fail. The testimony about the extortions was highly relevant to prove gang affiliation. The prosecutor couldn't help the witness's spontaneous elaboration as to why he was afraid, and, in context, there was no reason for the jury to assume that Tran, as distinct from somebody else, had executed the sister. The juror misconduct argument fails because a mere belief in caning as a punishment, in the abstract, does not equate with an inability to be fair in judging the facts of a given case. The Cunningham challenge is obviously a simple exercise in "issue preservation" in the hope that one day the federal courts will reject the reasoning of our highest court in People v. Black (2007) 41 Cal.4th 799 [62 Cal.Rptr.3d 569, 161 P.3d 1130]. And, while the use of a gun should not have been among the bases to both enhance Tran's sentence as well as having been one of several factors in the trial court's decision to impose consecutive sentences, we cannot say that there is a reasonable probability the trial court would do anything different on remand: Several other factors easily sufficed to justify consecutive sentencing.
The "654 issue," however, is different. This court's decision in People v. Herrera (1999) 70 Cal.App.4th 1456 [83 Cal.Rptr.2d 307], upholding a street terrorism conviction against a 654 challenge, is distinguishable. In Herrera, the defendant had an intent to kill people independent of their gang affiliation that was separate and independent of his intent to promote his gang. Here, however, at the two moments Tran pulled the trigger, in the one instance he was aiming at someone he knew to be a rival gang member and in the other instance he was aiming at a bystander whom he thought was a rival gang member, as shown by the fact that, as he aimed the gun, he exclaimed, "That's Play Boy," referring to a rival gangster. Moreover, the trial judge told the jury that the sole basis for the street terrorism conviction had to be either the attempted murder of the rival gang member, or the actual murder of the *146 bystander whom he thought was a rival gang member. Under such circumstances, People v. Vu (2006) 143 Cal.App.4th 1009 [49 Cal.Rptr.3d 765] where there was, like here, only one objective and intent in pulling the triggerrequires us to reverse the street terrorism conviction. Rather than remand for resentencing, though, we will simply modify the judgment on appeal to stay the sentence of three years for street terrorism. Tran will now be able to begin serving his life sentence with possibility of parole after 51 years, instead of 54.

II. FACTS[4]

A. The Gangs

Like other gang-related tragedies, we must begin by noting the existence of the competing foes. In this case, the feuding groups are two Vietnamese gangs, one known as the "VFL" or "Vietnamese for Life" and the other, the "OPB" or "Oriental Play Boys." A third gang, known simply as "V" plays a minor role in the story, since the "V" gang was on relatively good terms with the VFL at the time of the two shootings; indeed, a "V" member was present at both shootings and supplied the trial court with much of the testimony about precisely what happened.

B. The Provocation

On the morning of May 6, 1997, Duc Vuong, an OPB member, drove fellow OPB gang members "Wes" and "Andy" in his Acura to a gas station. When a Honda carrying three VFL members drove into the station, one of the VFL members asked what gang the three OPB members belonged to. Rather than answer, Wes drew a gun from his waistband. The Honda with the VFL members took off. Vuong got the gun and fired a "warning shot."

C. The Retaliation

1. The Plan
Soon after the gas station incident, Tran contacted Qui Ly, a V gang member, for some guns. Once Ly met up with Tran to give him the guns, Ly *147 learned that Tran needed the weapons because Tran wanted to retaliate against the OPB for the disrespect shown the VFL at the gas station. Ly, Tran, and other V and VFL gang members went to a private garage to discuss retaliating against Vuong. They planned to have Tran and two other VFL members carry guns into Vuong's home while the rest were to drive and wait in one of three cars. Their plans changed when they determined that Ly would not be a good getaway driver (he didn't know the fastest way to the freeway), so he was subbed in as a shooter for one of the VFL members.

2. The Initial Assault on Duc Vuong
Later that day, Vuong walked outside his apartment to pick up items from his car trunk. When he closed his trunk, he saw three men standing in front of him, including Tran. Tran fired the first shot at Vuong, then Ly and "Uncle Dave" (Huan Hoang Nguyen) also fired shots.
Vuong fled to his apartment. More shots were fired, one ultimately hitting Vuong's right shoulder.

3. The Shooting of the Bystander
About the same time as the attack on Vuong, Lon Bui had gone to the market with his mother to buy groceries. His mother lived across the street from his aunt, who lived in the same apartment complex as Vuong. While Bui was holding the groceries and using a key to open the front gate to the apartment complex, he chanced upon Tran and Ly as they were fleeing after shooting at Vuong. Bui turned to run away, but Tran told Ly, "Hey, that's Play Boy . . . that's him, that's him, that's Play Boy."
And with that, Tran kneeled down on one knee, took aim, and shot Bui. A shot went through his back, exited his abdomen, and lodged in his right arm. Bui bled to death.
A month later, at a wedding, Tran would learn from Ly that Bui was not a member of OPB. His response was terse. "Fuck it, like oh well."

D. The Prosecution

1. The Information
On March 2, 2001, the Orange County District Attorney filed a four-count information against Tran and Huan Hoang Nguyen. The counts were the murder of Bui, the attempted murder of Vuong, and street terrorism. On top *148 of those counts, the information charged enhancements for committing each crime for the benefit of a criminal street gang and for committing each crime with a firearm. Tran and Nguyen were tried separately.

2. The Gang Expert's Testimony
The prosecution introduced the testimony of a Garden Grove Police Department gang expert. He opined that (a) the VFL really was a gang, whose (b) primary activities were "extortion, prostitution, robberies [and] burglaries." The expert noted that in 1996 (and we remember that the events in this case took place in 1997) a VFL member was convicted of the 1992 murder of an OPB member.
The gang expert also testifiedover defense objections that the testimony was too inflammatorythat in 1995 Tran himself was convicted of a series of extortions in connection with the shakedown of Vietnamese businesses in Los Angeles for protection money. These extortions involved shots being fired into businesses coupled with verbal threats.

3. Ly's Testimony
Ly, as we have noted, was the prosecution's main witness because he was present at both shootings. While Tran's defense counsel sought to establish Ly's own hope of leniency in return for his testimony, the prosecution sought to establish the fact that Ly was taking his life into his hands in offering his testimony.
And Ly had good reason. A fellow V member, Hung Meo, had urged Ly not to get involved in the retaliation project. Indeed, Ly and Meo had hid out in hotels for about six weeks after the shooting. Sometime before trial, however, Meo was murdered in Mexico, along with his girlfriend. And Meo's girlfriend was Ly's sister.
The prosecutor, however, agreed in advance of Ly's testimony not to offer the fact that Ly's sister was killed with another gang member (Hung Meo) in Mexico, or to impute her death to Tran in any way. But that didn't stop Ly from blurting out the fact of his sister's murder in response to a question thatas we will now showdidn't ask for it.
We now set out the relevant testimony:
"Q: As you come here are you fearful of your life?
"A: Yes.
*149 "Q: Yes?
"A: I lost my sister, man. Executed."
With that, Ly began to cry. When he regained his composure, the questioning continued:
"Q: Mr. Ly, as you come here today and testify, do you believe that you're considered to be a snitch?
"A: Yes. . . .
"Q. And do you believe in that you are risking your life by coming here?
"A: Yes.
"Q: Why?
"A: Because I'm breaking the number one rule in the street life. I'm telling on a fellow gang member which can result in death or family members being hurt."
Defense counsel made a motion to strike the testimony about the death of Ly's sister as a "sympathy factor or something to support his credibility." However, the trial court denied her motion to strike the testimony, treating it as a motion for mistrial.

4. The Forensic Evidence
Part of Ly's testimony is that Tran acquired a "tech-nine." The weapon, technically known as the Intratec TEC-DC9, also known as "TEC-9," is of Swedish origin, later redesigned in the United States, intended for use as a cheap submachine gun. Hence, it has a magazine protruding from below the barrel, which would give it the appearance of having two handles. A witness who testified she saw two Asian men in the area of the attacks thus noted that one of them was carrying a two-handled, 12-to 14-inch black gun, which is a good description of a TEC-9.
We need only note here that there is no issue of substantial evidence in this appeal about who killed or tried to kill whom: There was testimony that showed a particular TEC-9 was used to shoot Bui, which corroborated Ly's eyewitness testimony that Tran shot Bui. Moreover, other forensic evidence excluded other nine-millimeter casings found at the apartment complex from *150 being that particular weapon. More plainly, there is no challenge on appeal to the proposition that it was Tran in particular who killed Bui.

5. The Conviction and the Ensuing Motions
The jury convicted Tran of all three charged counts of first degree murder, attempted murder, and street terrorism. The gang and firearm enhancements were found to be true for the counts of attempted murder and murder.
Before Tran could be sentenced, defense counsel made a motion for a new trial on August 11, 2005. The main basis for her motion stemmed from a conversation she had with Juror No. 8 after the verdicts were read. She declared, "Juror No. 8 was very vocal about his views on repeat offenders, recidivism and how to stop crime. He openly said that we should cane them just as they do in, I believe he said Singapore, and this would stop recidivism. He gave statistics for recidivism in Singapore and compared them to statistics in the United States." Since the defense counsel had Juror No. 8's contact information, she subpoenaed him. Once she learned that the court's approval was required for such a subpoena, defense counsel filed a petition with the court for juror identifying information and permission to subpoena the juror. Both the petition and the new trial motion were denied.
In addition, the motion for new trial was based on the trial court's denial of the defense counsel's motion for a mistrial for admitting Ly's testimony about the death of his sister.

6. The Sentence
At the sentencing hearing on December 23, 2005, Tran was sentenced to 25 years to life for murder, and a consecutive life term for the attempted murder. The enhancements added an additional 13 years to each sentence, 10 years for the use of a gun and three years for the gang enhancement. Finally, Tran was sentenced to a consecutive term of three years for the street terrorism count. The total sentence was 54 years to life.
All of the terms the trial court imposed for the enhancements were the maximum allowed by the enhancement statutes. The trial court rationalized this decision, as well as that to impose consecutive as opposed to concurrent terms by stating: "[the] crime involved great violence and great bodily harm. Disclosing a high degree of cruelty, viciousness and callousness. In this case [Tran] and his companions sought out, shot the victim, apparently due to gang rivalries, and in the process also shot and killed an innocent bystander who happened to cross their path. [¶] Also [Tran] was armed and used a weapon. That's a reason for consecutive terms. [¶] As to . . . aggravation on *151 the enhancements . . . both victims were particularly vulnerable. They were in or near the apartment complex which was a home when they were attacked by the gunman. [¶] Other reasons . . . [Tran's] prior convictions as an adult are numerous and of increasing seriousness . . . . [Tran] has served two prison terms."

III. DISCUSSION

A. The Evidence of a Prior Conviction for Extortion
(1) Let us begin our analysis of Tran's assertion that the court should have excluded the gang expert's testimony concerning Tran's conviction for extortion in 1994 by recognizing its strengths.[5] Courts have long held an antipathy for "other crimes evidence" in criminal prosecutions. (E.g., People v. Thompson (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883] [quoting 2 Wigmore, Evidence (1979 supp.) p. 187 concerning the "`highly inflammatory and prejudicial effect'" of "any evidence that involves crimes other than those for which a defendant is being tried" on the "trier of fact"].) The general "bar cram" rule is that evidence of an "uncharged" offense is barred because it merely proves a "propensity (or disposition) to commit the crime charged." (Thompson, supra, 27 Cal.3d at p. 316.) However, it still may be admissible if relevant in some other way. (Ibid.; see generally Evid. Code, § 1101, subd. (b) ["Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact . . . other than his or her disposition to commit such an act."].)
(2) In the present case, however, evidence of Tran's conviction for extortion was ineluctably relevant (we will discuss just how relevant soon) to prove the substantive charge of street terrorism under section 186.22, subdivision (a), which uses the phrase "pattern of criminal gang activity." Subdivision (e) of section 186.22 requires the prosecution, in order to show a "pattern of criminal gang activity," to prove the fact of "two or more" of a great list of 33 offenses, one of which, number 19, is the classic gang crime of felony extortion. Given that particular relevance, Tran does not argue (though his brief sort of nudges up to it) for the per se rule of exclusion under section 1101, subdivision (a) of the Evidence Code. That rule of exclusion applies when the "only theory of relevance" (as the court put it in People v. Thompson, supra, 27 Cal.3d at p. 316, italics added) is some purported propensity to commit the charged crime, and here the evidence was not offered to prove propensity.
*152 (3) Rather, Tran's attack comes by way of section 352, which, unlike Evidence Code section 1101, subdivision (a), is not framed as a prohibition on certain evidence, but a grant of authority to the trial court to use its discretion to exclude evidence which necessitates the "undue consumption of time," or creates a "substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."[6] While the plain text of the statute does not provide any authority for the idea that a trial court might somehow run afoul of the law by not excluding evidencethe text says what the trial court can do, not what it must doit is well established that there are times when the mix between probativeness and undue prejudice is so out of whack that a trial court abuses its discretionary authority under section 352 by not excluding evidence. (E.g., People v. Burns (1952) 109 Cal.App.2d 524, 541 [241 P.2d 308] [holding that certain autopsy photographs were "of no particular value to the jury," therefore it was clear "the only purpose of exhibiting them was to inflame the jury's emotions against defendant"].) Tran contends that this case is one of them.
We now make a couple of observations about section 352.
(4) First, it does not exist in a vacuum. This case, for example, entails its interaction with another statute, section 186.22. Thus, to the extent that section 352 contemplates the same subject matter as section 186.22, it must be construed consistently with it. (See, e.g., Broughton v. Cigna Healthplans (1999) 21 Cal.4th 1066, 1086 [90 Cal.Rptr.2d 334, 988 P.2d 67] ["When we construe potentially conflicting statutes, our duty is to harmonize them if reasonably possible."]; S&S Cummins Corp. v. West Bay Builders, Inc. (2008) 159 Cal.App.4th 765, 782 [71 Cal.Rptr.3d 828] [construing interest charge provision in public contracting statute to be "consistent with other statutes governing judgments"]; Decker v. City of Imperial Beach (1989) 209 Cal.App.3d 349, 360 [257 Cal.Rptr. 356] [interpreting government immunity statute so as to be consistent with other statutes touching on the subject of emergency rescue services].)
Second, as a general statute, section 352 must give way where overlapping subject matter is controlled by section 186.22, which is a more specific statute, and the two statutes cannot be reconciled. (See Stone Street Capital, LLC v. California State Lottery Com. (2008) 165 Cal.App.4th 109, 121 [80 Cal.Rptr.3d 326] ["the rule in California is that a specific statute controls over a general statute, regardless of which statute was passed earlier"].)
*153 Now, none of this is to say that section 352 is inconsistent with the more specific, later-enacted, street terrorism statute, section 186.22, subdivision (a). Nothing on the face of either statute necessarily contradicts the other. But it does suggest that, in ascertaining whether a trial court has abused its discretion in admitting evidence going to a street terrorism count as against a section 352 objection, the sort of evidence that the Legislature contemplated could be presented under section 186.22 must legitimately be included in the calculus of probativeness and undue prejudice under section 352.
(5) Two more important points about section 352 must also be noted now. One, the probativeness-undue prejudice balance should not be thought of as a scale holding two sets of weights, each independent of the other. Rather, as our high court said in People v. Karis (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189], "`The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (Id. at p. 638, italics added.) That is, undue prejudice and probativeness are, like space and gravity, interrelated. Undue prejudice itself is a function of the relevance of the probativeness of the evidence.
The other point is that courts must be careful to distinguish damaging evidence from unduly prejudicial evidence. (See Karis, supra, 46 Cal.3d at p. 638 ["`In applying section 352, "prejudicial" is not synonymous with "damaging."'"].) For example, given the clear relevance of the prior extortion conviction in this case, Tran's section 352 argument subtly conflates the two, by indiscriminately characterizing the extortion evidence as "prejudicial" when, as we now show, it was simply greatly damaging. In short, because it was highly probative, it must be prejudicial, says Tran.
Tran's point is, of course, untenable. The balancing between probativeness and undue prejudice under section 352 is, if anything, weighted in favor of admissibility. The prejudice must substantially outweigh the probativeness before there is any abuse of discretion in admitting the evidence. (E.g., People v. Doolin (2009) 45 Cal.4th 390, 439 [87 Cal.Rptr.3d 209, 198 P.3d 11] ["`Unless the dangers of undue prejudice, confusion, or time consumption "`substantially outweigh'" the probative value of relevant evidence, a section 352 objection should fail.'"].)
(6) Let us now also note a few things about section 186.22 that impact the balancing of probativeness and undue prejudice function of section 352. Section 186.22 clearly contemplates the presentation of not only evidence of other crimes (that is, crimes other than those the defendant is charged with in the current proceeding)that is remarkable enoughbut it also contemplates *154 evidence of "two or more" of such other crimes, and those crimes can be actual convictions. (See § 186.22, subd. (e) ["`pattern of criminal gang activity' means the . . . conviction of two or more of the following offenses . . .'"].) The Legislature thus contemplated that when street terrorism is charged, defendants will inevitably sustain that degree of damage that is necessarily attendant upon the presentation of the evidence of the "two or more" other crimes required to prove a "`pattern of criminal gang activity.'" (Cf. People v. Hernandez (2004) 33 Cal.4th 1040, 1044 [16 Cal.Rptr.3d 880, 94 P.3d 1080] [noting that when prosecution seeks criminal street gang enhancement, "it will often present evidence that would be inadmissible in a trial limited to the charged offense"].)
In other words, the Legislature said, in effect: When street terrorism is charged, we don't care about the damaging effect of the prosecutor's presentation of "two or more" other crimes. It just comes with the territory for prosecution of street terrorism.
(7) A particular aspect of the phrase, in section 186.22, subdivision (e), "two or more of the following offenses" is also remarkable. Not only does the phrase actually obligate the prosecution to put on evidence of at least two other crimes, but it clearly implies that the prosecution has the discretion to put on evidence of "more" than two other crimes. And the choice of words indicates that it does not mean, "and no more than three." If the Legislature wanted to say, "at least two but no more than three," it could have easily said so. The "or more" clause of the statute implies that if the prosecution decides, for example, that evidence of four other crimes is appropriate, then it may put on that evidence. Put another way, our Legislature has taken street gangsterism so seriously that it has built into the statute, in the engineering sense of the word, a certain amount of redundancy. (However, we need not express an opinion in this case as to whether a trial judge might be within his or her discretion, under section 352, to limit the prosecution merely to two other crimes.)
Another point of the text of section 186.22, subdivision (e) that is important for our analysis of whether the trial court abused its discretion under section 352 is that there is nothing in it that indicates that the defendant himself cannot be one of the "two or more persons" who must have committed "two or more" of the list of 33 crimes. Again, the Legislature could have said so. It didn't.
(8) Nowto the task that the prosecution faced in this case. The elements of street terrorism, according to People v. Lamas (2007) 42 Cal.4th 516, 523 [67 Cal.Rptr.3d 179, 169 P.3d 102], are:
*155  "Active participation in a criminal street gang, in the sense of participation that is more than nominal or passive,"
 "`knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,'" and
 "the person `willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.'"
Given these three elements, the probativeness of Tran's extortion conviction becomes overwhelming. What better way of showing all these elements in one fell swoop than by evidence that defendant hazarded a felony conviction for extortion in the service to his gang? The extortion evidence proved a high level of "activity," clear "knowledge" of the gang's felonious conduct, and his own willful promotion of the gang's interests.
Against this high level of probativeness, Tran's briefs on appeal assert that the prosecutor should have, in essence, given Tran the gratuitous break of going out of its way to confine the prosecution to the minimum of two predicate crimes, and, on top of that, chose as those two crimes offenses that either did not involve Tran, or used the offenses that Tran committed in this case plus someone else's crime. The answer to this contention is that there is nothing in section 352 that requires the prosecutor, in street terrorism prosecutions, to present only the most minimal and most innocuous evidence available.
(9) Indeed, in the case before us, the prosecution did not present the full range of evidence that section 186.22, subdivision (e) might contemplate. It presented, as "predicate acts" for the street terrorism count, (1) Tran's extortion conviction, (2) Tran's murder and attempted murder in the case before it, (3) the attempted murder of the rival gang member by another member of the assault team when he fired a shot at the member, and (4) the fact that another VFL member was convicted of a murder of an OPB member. As indicated above, Tran's conviction for extortion also served to show highly active involvement in the gang, his promotion of the gang's interests, and his knowledge of the gang's criminal nature.
Under all the circumstances, then, it can hardly have been an abuse of discretion for the trial judge not to exclude, under section 352, evidence of Tran's conviction for extortion. As the Attorney General aptly notes, there was no guarantee that the jury would accept the attempted murder of the rival gang member by another member of the assault team, or even the fact that another VFL member was convicted of murder of an OPB member. The Legislature contemplated some "cushion" for the prosecution in the number *156 of predicate crimes ("two or more") that might be proved in a street terrorism prosecution, and the trial judge specifically admonished the jury not to consider Tran's extortion conviction as evidence of a propensity to commit the charged crimes, and to only consider it in regard to the gang enhancements and street terrorism charge. The trial court was clearly "within the bounds of reason."

B. Ly's "Sister" Exclamation
Tran argues the trial court erred in denying its motions for a mistrial and a new trial based on the trial court's admission of Ly's testimony that he was afraid to testify because his sister had been "executed." Tran claims that such testimony was not relevant, and even if it was, it was unduly prejudicial because it created an inference that Tran was responsible for the deaths of Ly's sister and her boyfriend.
(10) First, because this is another section 352 argument and thus goes to the ultimate reasonableness of the trial court's call, we begin (again) by noting the high level of probativeness of the challenged evidence, here, Ly's quite legitimate and understandable fear in testifying. (See generally Evid. Code, § 780 [witness's "attitude . . . toward the giving of testimony" as one factor "the court or jury may consider in determining the credibility of a witness"].) As an example of that probativeness, consider that in People v. Olguin (1994) 31 Cal.App.4th 1355, 1368-1369 [37 Cal.Rptr.2d 596], this court had occasion to note the bolstered credibility of a witness who has the gumption to testify in the face of the possibility of recrimination: "A witness who testifies despite fear of recrimination of any kind by anyone is more credible because of his or her personal stake in the testimony. . . . [¶] . . . [T]he jury would be entitled to evaluate the witness's testimony knowing it was given under such circumstances. And they would be entitled to know not just that the witness was afraid, but also . . . those facts which would enable them to evaluate the witness's fear." (Italics omitted.)
Second, under established rules of appellate review, we are required to draw any conflicting reasonable inferences in favor of the judgment. That means, as regards the prosecutor's saying "[y]es?" to Ly's "yes" in answer to the question of whether he was fearful in testifying, we must draw the innocent inference that the prosecutor either didn't clearly hear Ly's answer and wanted him to merely repeat a simple "yes," as distinct from some bit of nefarious clever maneuvering to elicit the fact of the sister's murder. That inference is particularly reasonable when one realizes that there was nothing in the substantive question that called for Ly to augment his fear with an explanation for it. Thus there is no basis to impute any sort of misconduct to the prosecutor based on her merely asking a simple question about the witness's fear and then asking for a repeat of a simple yes answer.
*157 Third, there was an attenuation between the answer and any direct prejudice to Tran himself. We reject, as unrealistic, Tran's appellate argument that the answer somehow insinuated the idea that Tran himself executed Ly's sister. A juror with only the most elementary impression of gangs (say, based on television crime dramas like The Sopranos) would assume that gangs, with a collective will independent of any given member's status as a defendant, have a tendency to execute their members and member's relations when some line is crossed. The focus of Ly's answer was thus on the danger to himto Lyand not on what Tran personally had done or might do. In context, the statement simply said what any juror who watches television already knew: Internal gang discipline is brutal. You turn state's evidence not only at risk to yourself, but your family members. Given the facts of this case, the significance of that particular revelation was no big deal.[7]
Finally, we must remember that the quoted exchange came out on redirect examination. That is, the original fear question was reasonably related to Ly's credibility, attacked on cross-examination. (Attacking Ly's credibility was of course easyhe had at least something to gain from turning on his former allies.) Thus we may reasonably infer that the prosecutor's motive in asking the fear question was pure: She was not trying to bring out any sympathy for the sister. She simply wanted the jury to know that Ly was risking his life in testifying, despite the fact he had something to gain by testifying.
Given the four factors identified above, we can hardly say that the trial judge's decision was unreasonable.[8]

*158 C. Juror "Misconduct"
Tran argues that a juror who, after the trial, expressed the opinion that recidivists should be caned, as is done in Singapore, committed juror misconduct by concealing his bias in favor of the prosecution during voir dire.
(11) To establish even a prima facie case of juror misconduct based on concealed bias, there must be "questioning" that "is sufficiently specific to elicit the information which is not disclosed, or as to which a false answer is later shown to have been given." (See People v. Blackwell (1987) 191 Cal.App.3d 925, 929 [236 Cal.Rptr. 803].) Here, the question that Juror No. 8 supposedly didn't answer truthfully was: "If selected, can you be fair, impartial and follow the law?"
The requisite specificity is not shown. There is no "fit" between the question and the supposedly false answer. Tran's juror misconduct argument is based on a serious flaw in logic. The flaw in logic is that certain (let us call them illiberal) attitudes toward punishment necessarily mean that a juror cannot be fair in the determination of the facts of a case.
Nonsense. There is no necessary relation between an individual's ability to be fair and impartial in the determination of facts and an individual's philosophy of punishment, whether founded on moral desert, deterrence or even rehabilitation.
The lack of a necessary connection is illustrated by a First Circuit opinion evaluating a state conviction for first degree murder on federal habeas corpus, Mello v. DiPaulo (1st Cir. 2002) 295 F.3d 137. In Mello, the defendant in an arson-murder case contended that his trial counsel represented him ineffectively because the trial counsel did not exercise a peremptory challenge against a juror whose own father was a firefighter. The First Circuit observed that "the decision by defense counsel of an accused arsonist to permit the child of a firefighter to sit on the jury seems odd . . . ." (Id. at p. 147.) But odd as it was, there was no ineffective assistance because there was no prejudice, because the juror had sworn, like the proponent of caning in the case before us, to be "fair and impartial." (Ibid.) We need only add that George Washington apparently saw no intrinsic reason not to impose the penalty of 100 lashes for a deserter during the revolutionary war.[9] Under *159 Tran's argument, a resurrected George Washington who answered in voir dire that he would be fair and impartial in judging the facts of the case would still be committing "juror misconduct" by concealing a proprosecution bias based merely on his willingness to countenance whipping as a punishment.

D. The Cunningham Challenge
(12) Less than two years ago, the United States Supreme Court held in Cunningham v. California, supra, 549 U.S. 270, 288 (Cunningham) that California's determinate sentencing law was unconstitutional insofar as it gave the trial judge discretion to impose higher sentences for criminal defendants based on circumstances established by a mere preponderance of the evidence as determined by the court, when those circumstances should have instead been established beyond a reasonable doubt as determined by a jury. The court said: "Except for a prior conviction, `any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" (549 U.S. at pp. 288-289.)
In the present case, the trial court imposed upper terms because of the violence, callousness and cruelty attendant to the charged crimes, the vulnerability of the victims (both attacked near their homes), Tran's "numerous" prior convictions of increasing seriousness as an adult, and two prior prison terms. It also imposed consecutive terms because the crimes were committed while Tran was armed, and used a weapon. All of this "consecutizing" and "upper-terming" Tran now ascribes as Cunningham error.
(13) No. First, we note that the trial judge had authority under California law to use increasingly serious prior prison terms as aggravating factors to impose upper terms. California Rules of Court, rule 4.421(b)(2) lists "The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness" as a factor for determining "[c]ircumstances in aggravation" for purposes of sentencing. And one should recall that Cunningham specifically excluded prior convictions from its holding. (Cunningham, supra, 549 U.S. at p. 291.)
(14) And second, dispositively, the matter was settled by our state Supreme Court in People v. Black, supra, 41 Cal.4th 799 (Black II). There the court said that a "defendant's criminal history" was an "aggravating circumstance[] that independently satisf[ied] Sixth Amendment requirements" and did not need to be submitted to the jury. (Id. at p. 820.) More specifically, Black II said: "[S]o long as a defendant is eligible for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any *160 number of aggravating circumstances in exercising its discretion to select the appropriate term . . . regardless of whether the facts underlying those circumstances have been found to be true by a jury." (Id. at p. 813, italics omitted.)
As to the consecutizing of sentences, we again note that the trial judge had the authority under California law to do so. (See § 669 [general authority of trial judge to impose consecutive sentences].)[10]
(15) And, as to whether consecutive sentences contravened federal law, the question has again been answered by Black II: "The determination whether two or more sentences should be served [consecutively] is a `sentencing decision[] made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense' and does not `implicate[] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense.'" (Black II, supra, 41 Cal.4th at p. 823.)
As an intermediate appellate court, we are bound by Black II. The reply brief treats us to a lengthy discussion as to why Black II is incorrect, in an obvious (though understandable) attempt to preserve the Cunningham issues for the day when our own high court overrules Black II or the United States Supreme Court disapproves it. The discussion might form the basis of an interesting law review article, but until that day comes, it is, from this court's point of view, strictly academic. As far as we are concerned, Black II ends the issue.
Except for one thing. The reply brief attempts to distinguish Black II on the theory that, in this case, there is a mitigating factorprior satisfactory performance on parolewhile Black II itself involved no countervailing mitigating factors. On this point, there are two answers.
First, the issue was waived. There was no attempt in the opening brief to distinguish Black II, which, in the context of this argument, would have been the natural place to raise the inapplicability of Black II. (Tran's appellate counsel obviously knew that Black II would have to be addressed if a Cunningham issue were raised. The table of contents for just the state cases alone mentioned in the opening brief goes on for six pages.)
(16) Second, on the merits, the rationale of Black II necessarily includes recidivist aggravating factors even with balancing mitigating factors, at least *161 when the mitigating factor, as it is hereperformance on paroleis inherently linked to the aggravating factorhere, prior prison terms. As Black II said: "The determinations whether a defendant has suffered prior convictions, and whether those convictions are `numerous or of increasing seriousness'. . . require consideration of only the number, dates, and offenses of the prior convictions alleged. The relative seriousness of these alleged convictions may be determined simply by reference to the range of punishment provided by statute for each offense. This type of determination is `. . . one more typically and appropriately undertaken by a court.'" (Black II, supra, 41 Cal.4th at pp. 819-820, italics added & citation omitted.) Without prison, there is no parole.

E. The Dual Use of the Gun's Use
California Rules of Court, rule 4.425(b) says: "Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] . . . [¶] . . . A fact used to otherwise enhance the defendant's prison sentence . . . ." Yet, this prohibited action is precisely what the trial court did in this case. At Tran's sentencing hearing, the trial court stated, "Also the defendant was armed and used a weapon. That's a reason for consecutive terms." This same factuse of a weaponwas also used as the basis for a firearm enhancement pursuant to section 12022.5, subdivision (a) (which can be imposed on "any person who personally uses a firearm in the commission of a felony or attempted felony") to twice enhance defendant's sentence by ten years.
We agree with both parties that the trial court erred in using the same factor to both enhance Tran's sentence and to run it consecutively.
So the real question is whether the error was harmless. Answer: Yes.[11]
(17) Only a single factor is needed to impose consecutive sentences. (People v. Osband (1996) 13 Cal.4th 622, 728-729 [55 Cal.Rptr.2d 26, 919 P.2d 640] (Osband).) Recall that California Rules of Court, rule 4.425 allows any circumstance in aggravation to be used in imposing consecutive sentences, except that otherwise prohibited under the rule. And the standard for harmless error is reasonable probability of a more favorable result. (E.g., People v. Avalos (1984) 37 Cal.3d 216, 233 [207 Cal.Rptr. 549, 689 P.2d 121] ["`"it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."'"].)
*162 When the use of a gun is stripped away from the trial court's reasoning, there remain two overarching factors, immune from Cunningham considerations, that justified the imposition of the consecutive sentences: Numerous prior convictions of "increasing seriousness" combined with the fact that Tran had "served two prison terms."
In short, Tran is a career criminal with a long rap sheet, and two previous stays in the big house had done nothing to dampen his devotion to his gang. Given the strength of those factors, it is clear that the improper double use of the use of a weapon was just frosting on the cake. (Cf. People v. Avalos, supra, 37 Cal.3d at p. 233 [court could not "determine whether the improper factor was determinative for the sentencing court"].) Indeed, given the record and the court's remarks here, it is well nigh impossible to imagine Judge Fitzgerald giving any lesser sentence if Tran had not used a gun at all. (See ibid. [Considering the circumstances, especially "the court's remarks" to conclude that "it seems clear that the improper dual use of facts was not determinative."]; Osband, supra, 13 Cal.4th at p. 729 ["In this case, the court could have selected disparate facts from among those it recited to justify the imposition of both a consecutive sentence and the upper term, and on this record we discern no reasonable probability that it would not have done so. Resentencing is not required."].)

F. The Section 654 Issue
(18) In Neal v. State of California (1960) 55 Cal.2d 11 [9 Cal.Rptr. 607, 357 P.2d 839], the Supreme Court articulated what has come to be known as the single objective and intent test for application of section 654.[12] Said the court: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (55 Cal.2d at p. 19, italics added.)
In People v. Latimer (1993) 5 Cal.4th 1203 [23 Cal.Rptr.2d 144, 858 P.2d 611], our high court noted section 654 does not apply when the defendant has *163 separate but simultaneous objectives. (See 5 Cal.4th at p. 1212 [noting nonapplication of § 654 in cases of "separate, although sometimes simultaneous, objectives"].)
In People v. Herrera, supra, 70 Cal.App.4th 1456, this court applied the separate but simultaneous objective test to conclude that section 654 did not apply where a gang member went on a driveby shooting spree motivated by both a desire to promote the gang and "simply a desire to kill." (70 Cal.App.4th at p. 1467.)
We stress: In the present case, unlike Herrera, the evidence affirmatively excludes even the possibility that Tran might have had separate, but simultaneous, motives. Tran exclaimed, "Hey, that's Play Boy . . . that's him, that's him, that's Play Boy," when he shot Bui. The statement will admit of no other possibility but that when Tran shot Bui, he did not have a generalized desire to kill, but the specific desire to kill a rival gang member, as evidenced by the use of the gang moniker.
Given these facts, the case of People v. Vu, supra, 143 Cal.App.4th 1009, rather than Herrera, controls. In Vu, like here, but unlike Herrera, there was no evidence that the defendant's shooting of a bystander had a dual purpose of a simple "desire to kill" along with his desire to promote his gang. We therefore follow Vu and apply section 654 in this instance.
In supplemental briefing,[13] the issue was raised as to whether Tran's uncharged procurement and possession of a firearm in the course of preparation for the shootingTran is, after all, a convicted felon[14]might serve as a basis for the street terrorism conviction independent of the shots fired at Vuong and Bui. Tran's appellate counsel, however, points out that being a felon in possession of a firearm was never charged. Moreover, and most persuasively, the trial judge specifically instructed the jury that it was the two shootings that constituted the basis for the street terrorism charge, never mentioning that being a felon in possession was a potential basis on which to convict Tran of street terrorism.[15]
*164 (19) We cannot uphold the street terrorism conviction under the facts of this case based on a crime never charged, because such a procedure would offend the due process need for jury unanimity in criminal cases. (See People v. Jones (1990) 51 Cal.3d 294, 305 [270 Cal.Rptr. 611, 792 P.2d 643] ["the defendant has a due process right to fair notice of the charges against him and reasonable opportunity to defend against those charges"], 321 ["we acknowledge that the requirement of unanimity in criminal cases is of constitutional origin"].) More specifically, the prosecutor elected (and the trial court instructed the jury accordingly) to base the street terrorism conviction only on the charged shootings. As the court said in People v. Mayer (2003) 108 Cal.App.4th 403, 418 [133 Cal.Rptr.2d 454]: "When a defendant is charged with a single offense, but there is proof of several acts, any one of which could support a conviction, either the prosecution must select the specific act relied upon to prove the charge, or the jury must be instructed that all the jurors must agree that the defendant committed the same act or acts. [Citation.] When the prosecutor does not make an election, the trial court has a sua sponte duty to instruct the jury on unanimity. [Citation.]" (Italics added.)
The Attorney General offers us no basis on which to say that the jury unanimity requirement does not apply here. Nor do we see one ourselves. The street terrorism conviction must, accordingly, be stayed under section 654.
However, as mentioned above, there is no need to reverse the judgment; we simply modify the sentence here to provide for the stay of the street terrorism term.

*165 IV. DISPOSITION
The judgment is modified to require that the three-year sentence for street terrorism count be stayed. The judgment is affirmed as to the remaining 51 years, and in all other respects.
Bedsworth, J., and Moore, J., concurred.
NOTES
[1] A number of these issues give rise to "spin-off" issues, making his brief appear to raise more issues than just these basic six. For example, a spin-off of issue (3), involving juror misconduct, is the subissue whether the trial court erred in denying an evidentiary hearing to inquire into the bona fides of the misconduct charge. Another spin-off issue is the assertion that the evidentiary issues (1) and (2) had the "cumulative" effect of undermining the fairness of the trial.
[2] All undesignated statutory references in this opinion are to the Penal Code, with the exception of any reference to section 352, which is to the Evidence Code.
[3] After Cunningham v. California (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856].
[4] Appellant's opening brief is a series of summaries of testimony, rather than an attempt to construct a single, chronological narrative of events. If this were a substantial evidence case, there might be a method to that madness. But substantial evidence is an issue most assuredly not part of this appeal. The Attorney General's hard work in constructing a unified story line is more helpful to the court in understanding the precise facts in this case. (See Chen v. County of Orange (2002) 96 Cal.App.4th 926, 931, fn. 1 [116 Cal.Rptr.2d 786] [because appellant presented facts without regard to chronological order, appellant had no cause to complain if court's statement of facts followed "more closely the chronologically oriented statement of facts in the respondent's brief"].)
[5] The issue was well preserved for appeal, having been raised both prior to trial, by way of an objection to the use of any of Tran's prior criminal acts other than for impeachment, by objection at the time of the question, and by way of a motion to strike the gang expert's testimony after it was given.
[6] Here is the complete text of section 352: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."
[7] Indeed, at no point did Ly state that Tran had threatened him personally or that Tran was in any way involved with the murders of Ly's sister or Meo.
[8] And, to the degree that there is any strand of argument based on prosecutorial misconduct in the prosecutor's "yes?" here, People v. Leonard (2007) 40 Cal.4th 1370 [58 Cal.Rptr.3d 368, 157 P.3d 973] disposes of it. There, a prosecutor asked a detective this question: "`And what did you tell him,'" i.e., what the detective told the defendant. (Id. at p. 1405.) The question elicited the answer that the detective told the defendant "`we were doing the investigation regarding the thrill killer, and that his name had come up as a result of being spoken to by officers . . . .'" (Ibid., original italics.) The reference to "thrill killer" violated a stipulation "not [to] mention that this was the matter referred to in the news media as the "Thrill Killer' case." (Ibid.) The Leonard court held that even if the defense had preserved the issue, there was no prosecutorial misconduct because the "prosecutor's question was innocuous, and there [was] no evidence that he asked it with the intent to elicit [a] reference to the Thrill Killer." (Ibid.) The questions in the case before usthe substantive "As you come here are you fearful of your life?" and the subsequent "yes?" were objectively less likely to elicit information about the death of Ly's sister than the question "`And what did you tell him'" was to elicit information about the investigation of the "Thrill Killer."
[9] See Hapgood, George Washington (2008) page 82. (As of this writing, the cited reference is easy to find online at Google books, if one types in "George Washington" "lashes" and "Hapgood.") In the same vein, Thomas Jefferson held ideas about appropriate punishments that would make our juror who favors caning for recidivists in the present case seem like a member of Amnesty International.
[10] The statute states in pertinent part: "When any person is convicted of two or more crimes . . . the second or other subsequent judgment . . . shall direct whether the terms of imprisonment . . . shall run concurrently or consecutively. Life sentences . . . may be imposed to run consecutively with one another, with any term imposed for applicable enhancements, or with any other term of imprisonment for a felony conviction."
[11] While the Attorney General posits that Tran waived the issue by failing to object at trial, the Attorney General addresses the merits of the point because of the ineffective-assistance-of-counsel claim that accompanies the failure-to-object rejoinder. Since we conclude any failure to object was harmless, the ineffective assistance claim is moot.
[12] Section 654 provides: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other. [¶] (b) Notwithstanding subdivision (a), a defendant sentenced pursuant to subdivision (a) shall not be granted probation if any of the provisions that would otherwise apply to the defendant prohibits the granting of probation."
[13] We grant the Attorney General's request for judicial notice of the legislative history of the California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.).
[14] See section 12021, subdivision (a)(1) (convicted felons commit another felony if they have a firearm in their possession or control).
[15] The main point we established in Herrera was that the crime of street terrorism had, as its "gravamen," the "participation in the gang itself." (Herrera, supra, 70 Cal.App.4th at p. 1467, italics omitted.) One can thoroughly participate in a criminal street gang, fully and repeatedly, without ever pulling a trigger and killing another human being. Thus, as in Herrera, when one gang member jumps into a car with his gang buddies, pulls out two guns and yells that his "home boys [are] after the guys," the ensuing drive is for the express purpose of participation in the gang's criminal activities. The driving served the gang's primary purpose, but the driving itself did not require any of the car's occupants to not only shoot at the home of a rival's mother, but also spray the vicinity with bullets, hitting two innocent bystanders on the first pass and then turning around and further spraying the neighborhood with bullets a second time, hitting and damaging multiple parked cars. (Id. at p. 1461.)

By contrast, in the case at bar the record requires us to proceed on the premise that Tran did nothing else of a criminal nature but shoot a rival gang member and at someone Tran expressly thought was a rival gang member. Remember that here the trial court specifically instructed the jury that the two shootings were the sole acts it could use to support the street terrorism charge. This distinction makes Herrera inapplicable.
While Tran's very presence might have constituted adequate encouragement to his fellow gang members, prompting them to carry out a lethal assault, we cannot infer, under the circumstances of this case, where the trial court specifically instructed the jury that the two shootings were the sole acts it could use to support the street terrorism charge, that the fact of his presence alone is sufficient evidence to support a street terrorism conviction. However, nothing we say in this opinion is intended to suggest that, had the trial court not so limited the jury in its instructions concerning the street terrorism charge, section 654 would be applicable.